# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| JANICE BRADDY, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:16-0748 |
| | ) | Judge Trauger |
| v. | ) | |
| | ) | |
| FIVE STAR FOOD SERVICE, INC., | ) | |
| | ) | |
| Defendant. | ) | |

---

## MEMORANDUM IN SUPPORT OF JOINT MOTION TO APPROVE SETTLEMENT

---

### I.    PRELIMINARY STATEMENT

Subject to Court approval, the Named Plaintiff, Janice Braddy ("Braddy"), and the Opt-in Plaintiffs (together with Braddy, the "Plaintiffs") and Defendant Five-Star Food Service, Inc. ("Defendant" or "Five Star", together with the Plaintiffs, the "Parties") have entered into an agreement to settle the Plaintiffs' claims (the "Settlement Agreement"). The proposed Settlement Agreement resolves all claims that were, or could have been brought in this action with the Plaintiffs only releasing FLSA and state wage and hour claims.[1] The Parties respectfully request

---

[1] The relevant portion of the release language states that Plaintiffs are releasing "any and all FLSA and state wage and hour claims, including, but not limited to, claims under or based upon the Tennessee Wage Regulation Law and common law claims for breach of express contract, quasi-contract, or unjust enrichment, whether brought pursuant to statute or under common law, whether specifically asserted or not, which the Releasers, or any of them, may assert relating to FLSA violations or similar wage and hour claims under state law arising up to and including the date of approval of this Settlement by the Court for the time period Plaintiffs worked for Defendant. This release does not extend to claims for workers' compensation, claims brought under Title VII of

that the Court enter an order as follows: (1) approving and adopting the terms of the Settlement Agreement between the Parties, including the payments to Plaintiffs, the service payment to Braddy and the payment of costs and fees to Plaintiffs' counsel; and, (2) dismissing with prejudice the Plaintiffs' claims against Defendant, consistent with the release contained in the agreement.

## II.     Plaintiffs' Claims and Defendant's Defenses

This is a Fair Standards Labor Act (FLSA) collective action in which the Parties agreed to send Court-supervised notice to:

> All current and former hourly-paid cafeteria services employees of Five Star Food Service, Inc. who have worked in any dining facility (including micromarkets that offer dining services) for any period of time from April 15, 2013 to the present.

Notice issued and 94 individuals opted-into this case, for a total of 95 Plaintiffs.[2] Plaintiffs' claims are relatively simple. They claimed that Defendant had a policy or practice of illegally deducting a 30-minute meal period for its cafeteria and convenience store workers even though its workers were not able to take a meal break. Defendant denied the allegations, pointing to a host of corporate policies designed to prevent such off the clock work, and alleging that its workers have ample opportunity to take a 30-minute meal break each day. Defendant also raised a more practical defense: Defendant's records showed that Plaintiffs were paid more than the federally-mandated minimum hourly wage ($7.25) during the relevant time period. In fact, the majority of the Plaintiffs were paid at hourly rates in excess of $9.00 per hour. The average hourly rate for all Plaintiffs was approximately $10.15 per hour. As such, assuming *arguendo* that Plaintiffs were deprived of lunch breaks and worked 2.5 hours a week off (which would equal five unpaid half

---

the Civil Rights Act of 1964 ("Title VII") or other statutory or common law claims unrelated to the asserted nonpayment of compensation for hours worked and/or overtime pay."

[2] This number includes 4 individuals who returned their consent to sue form after the deadline. As part of the settlement, the Parties have agreed to include these workers in the settlement.

hour meal periods per week) Plaintiffs would have rarely worked overtime hours even if the Plaintiffs were hypothetically deprived of five lunch breaks per week and worked 2.5 hours a week off the clock. In this regard, Defendant pointed out that the majority of the Plaintiffs averaged less than 37.5 hours per work week over the course of their employment. So, the addition of 2.5 hours a week to the Plaintiffs' typical work week would not have caused the Plaintiffs to have incurred overtime pay. As such, the Defendant argued that the FLSA provided no remedy for the Plaintiffs' alleged FLSA damages even assuming *arguendo* that the Plaintiff could prove its assertions with respect to the deprivation of lunch breaks.

More specifically, with respect to the issue of overtime hours, Defendant alleged that, assuming that every Plaintiff worked 2.5 hours a week (one 30-minute meal for five days) off-the-clock, only 19 of the 95 Plaintiffs would have exceeded a 40-hour workweek during their employment based on their average hours worked per week during their period of employment. This argument is significant because, given their rates of pay, the Plaintiffs' FLSA claims would only have merit in weeks in which they worked more than 40 hours in a work week (including the alleged off the clock work). Although Plaintiffs dispute Defendant's specific conclusions, the time and pay data produced by Defendant does, in fact, indicate that Plaintiffs would not hit the overtime threshold in a significant portion of the workweeks at issue, even assuming 2.5 hours per week of off the clock work.[3]

---

[3] Based on the way the data was maintained by the Defendant's time-keeping system (which system changed over the relevant term), it was extremely time-consuming to calculate how many workweeks may result in overtime damages for all workers. *Yezbak Dec., ¶ 8*. Plaintiffs, therefore, analyzed a sample of 23 workers from Defendant's largest locations, which revealed that these workers recorded at least 37.5 hours in only 58% of their workweeks. *Id.* This matters because, among other reasons: (1) workers would need to prevail on breach of contract claims to recover straight time wages for non-overtime work weeks; (2) breach of contract claims do not provide liquidated damages; and, (3) the overtime rate is 1.5 times the straight time rate.

3

### III.     Summary of the Settlement Terms

This case was mediated on August 8, 2017 by Attorney Robert E. Boston of Waller Lansden Dortch & Davis, LLP in Nashville.  At mediation, Plaintiffs were represented by Attorneys Charles Yezbak and Daniel Arciniegas, who are both experienced in prosecuting wage and hour disputes.  Plaintiff Braddy was present for the entirety of the mediation.  Defendant was represented by Attorneys John Harrison and Tim Mickel who are also experienced in defending such claims.  Several representatives of the Defendant were also present for the entire mediation.  Countervailing arguments and positions were professionally and civilly posited, discussed and analyzed by competent counsel and representatives of the Parties on both sides of the case.  Only after a long and protracted day of settlement discussions and intensive analysis, led by Attorney Boston, were the parties able to come to an agreement suitable and acceptable to all. The settlement reached at mediation, as now codified in the Settlement Agreement, is as follows:

Defendant will pay a gross settlement amount of $252,000.  Of this gross settlement amount 34%, or $85,680, will be paid to Plaintiffs' counsel as attorneys' fees and $5,125.20 will be paid to Plaintiffs' counsel to reimburse costs that have been incurred in this action.  A service payment of $5,000 will be paid to Braddy.  The net settlement amount of $156,194.80 will be allocated using a point system where each week worked in the three-year FLSA recovery period is allocated one point. Plaintiffs receive their pro rata share of the total points, except that each Plaintiff will receive a minimum of $50 regardless of the number of points.  The payments to Plaintiffs are split evenly between backpay and liquidated damages.  As set forth in Exhibit A to the Settlement Agreement, the total weeks worked during the recovery period is 5067, the net settlement amount is $156,194.80, which means each week is worth $31.  This means Plaintiffs' net recovery (after attorneys' fees, costs and service payments) is equivalent to adding 2:02 of

4

overtime or 3:03 of straight time each work week assuming a regular rate of pay of $10.15 per hour. Stated differently, Plaintiffs net recovery is equal to approximately 6 unpaid 30-minute meal periods at straight time or roughly 4 unpaid 30-minute meal periods at an overtime rate. This is a fair resolution of the claims and results in an average net recovery to Plaintiffs of $1,644.16, with the largest amount recovered equaling $6,295.08.

After agreeing to the settlement, Plaintiffs' counsel sent letters and emails to each Plaintiff notifying them of: (1) the gross settlement amount; (2) the attorneys' fees and costs; (3) the service award to Braddy; (4) the net settlement amount; (5) the method of allocating the net settlement amount; (6) the employment dates Defendant had on file for each Plaintiff; and, (7) the expected amount before tax withholdings. *Yezbak Dec., ¶ 10*. Counsel also advised each Plaintiff to contact counsel if they disputed the employment dates contained in the letter.[4] *Id.* One Plaintiff contacted counsel claiming to have worked longer than the amount shown. *Id.* Plaintiffs' counsel requested any documents that individual had related to their employment dates. *Id.* Counsel also contacted Defendant to check the employment dates. *Id.* Defendant confirmed the dates were correct. *Id.* Counsel confirmed the dates in the payroll records Defendant produced in discovery. *Id.* Counsel attempted to reach that Plaintiff numerous times to follow up but counsel's calls went unreturned. *Id.* No one else disputed their employment dates or complained about the settlement. *Id.* To the contrary, counsel received numerous calls in support of the settlement. *Id.* The settlement is fair and the Plaintiffs are supportive of the settlement. *Id.*

---

[4] After the initial mailing to Plaintiffs, Defendant updated employment dates for several Plaintiffs, which resulted in changes in their allocation. Plaintiffs' counsel notified these Plaintiffs of the changes and all were supportive of the settlement.

5

## IV. Legal Standard and Argument

### A. The Settlement is Fair, Reasonable, and Adequate and Warrants Approval.

Where parties settle or compromise an FLSA back wage claim, the parties must seek court approval for the proposed settlement. *Simmons v. Mathis Tire & Auto Serv.*, No. 13–2875–STA–tmp, 2015 U.S. Dist. LEXIS 114008 (W.D. Tenn. Aug. 20, 2015). Approval of a fair and reasonable agreement promotes the public's interest in encouraging settlement of litigation. *Edwards v. City of Mansfield*, No. 1:15-CV-959, 2016 U.S. Dist. LEXIS 64159 (N.D. Ohio May 16, 2016); *Williams v. K&K Assisted Living LLC*, No. 15-cv-11565, 2016 U.S. Dist. LEXIS 9310 (E.D. Mich. Jan. 27, 2016) (district courts may approve FLSA settlements "in order to promote the policy of encouraging settlement of litigation") (*quoting Lynn's Food Stores, Inc. v. U.S. By & Through U.S. Dep't of Labor, Employment Standards Admin., Wage & Hour Div.*, 679 F.2d 1350, 1354 (11th Cir. 1992)). Settlement agreements assure that plaintiffs will receive compensation for the alleged violations at issue. As one district court in this Circuit explained "the certainty and finality that comes with settlement also weighs in favor of approving a fair and reasonable settlement." *Edwards v. City of Mansfield*, 2016 U.S. Dist. LEXIS 64159 at *10.

The standard for approval of an FLSA settlement is significantly lower than for a Rule 23 settlement because "an FLSA settlement does not implicate the same due process concerns as a Rule 23 settlement." *Flores v. One Hanover, LLC*, No. 13 Civ. 5184 (AJP), 2014 U.S. Dist. LEXIS 78269 (S.D.N.Y. June 9, 2014). If the proposed settlement reflects a reasonable compromise over contested issues, the settlement should be approved. *Simmons v. Mathis Tire & Auto Serv.*, 2015 U.S. Dist. LEXIS 114008 at *2.

The existence of a bona fide dispute serves as a guarantee that the parties have not manipulated the settlement process to permit the employer to avoid its obligations under the FLSA. *Id.* When considering the fairness, reasonableness, and adequacy of a proposed agreement, the

court "should also consider the following factors: [1] the risk of fraud or collusion, [2] the complexity, expense, and likely duration of the litigation, [3] the amount of discovery completed, [4] the likelihood of success on the merits, and [5] the public interest in settlement." *Survance v. Healthcare Servs. Grp., Inc.,* No. 5:15CV1233, 2015 U.S. Dist. LEXIS 146928, 3-4 (N.D. Ohio Oct. 29, 2015) (citing *Int'l Union, United Auto., Aerospace, and Agr. Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007)). "The court may choose to consider only factors that are relevant to the settlement at hand and may weigh particular factors according to the demands of the case." *Edwards v. City of Mansfield*, 2016 U.S. Dist. LEXIS 64159 at \*7-8.

### 1. The Adversarial Nature of the Litigation Demonstrates that the Settlement is the Result of a Bona Fide Dispute, Eliminating the Risk of Fraud or Collusion [Factor 1].

"Typically, courts regard the adversarial nature of a litigated FLSA case to be an adequate indicator of the fairness of the settlement," and "approve FLSA settlements when they are reached as a result of contested litigation to resolve bona fide disputes." *Simmons v. Mathis Tire & Auto Serv.*, 2015 U.S. Dist. LEXIS 114008 at \*2. (citing *Lynn's Food Stores, Inc. v. U.S.*, 679 F.2d 1350, 1353-54, 1353 n.8 (11th Cir. 1982)).

As discussed in Section III, *supra,* the instant settlement was the result of an intensive, arms-length mediation with a well-respected mediator (Attorney Bob Boston of Waller Lansden). The parties were represented by counsel experienced in wage and hour law, conducted sufficient strategically-targeted discovery to adequately assess the strengths and weaknesses of each side's positions, exchanged meaningful damage calculations and assumptions, and engaged both mutually and independently in complex analyses of the available data. Therefore, approval is warranted under the first factor of the Court's analysis.

7

## 2. The Complexity, Expense, and Likely Duration of the Litigation Support the Instant Settlement [Factor 2].

There were a number of factors that both Parties reasonably believed would serve to increase the anticipated expense, complexity and duration of this case. First, Defendant's business was divided in three categories ((1) micro markets; (2) office food service; and (3) dining halls) and spread across approximately 36 different locations in 9 different "regions" over 3 states. *Id.* at ¶ 6. 61 of the Plaintiffs worked in 11 locations. The remaining locations employed only 1 or 2 Plaintiffs. *Id.* Defendant alleged that the locations themselves were often operated differently depending upon the requests of the underlying Five Star client and provided different services such that each location had its own nuances that would need to be fully considered and analyzed in a wage and hour analysis. *Id.*

Second, as a matter of what the Defendant contends to be the normal operation of its business, the Defendant alleged it had been working over the course of the relevant period to migrate to a new on-line timekeeping and payroll system to standardize its record-keeping across its many locations. *Id.* at ¶ 7. So, as a result, the Defendant effectively utilized two different record-keeping systems during the relevant time period. *Id.* Defendant alleged that the date of implementation of the newer timekeeping system was not standard and varied by location. *Id.* Further, Defendant alleged that because of the change in the system, many of the Defendant's older records were only available for production in a pdf format. *Id.* The result of the Defendant's change in its system, as it pertains to examination of Defendant's records, was that it rendered the bulk analysis of Defendant's timekeeping and payroll records extremely difficult and time-consuming.

Nevertheless, the Parties worked cooperatively to minimize litigation and discovery costs by identifying and exchanging particularly relevant and necessary items of information and

documents – before attempting mediation. However, there is still significant discovery left to complete should the matter proceed to trial. *Id.* at ¶ 5. Plaintiffs would need to follow up on their request for supplemental production of documents such as internal emails, personnel files of managers, documents relating to reports of off the clock work, any training or advice about the FLSA, and the like. *Id.* There was the very real possibility of costly discovery disputes with respect to several of these requests as Defendant had posited objections or otherwise sought to limit the scope of Plaintiffs' requests. Plaintiffs also intended to take a Rule 30(b)(6) deposition of Defendant on numerous topics, as well as the depositions of at least 6 managers and former managers. *Id.*

The Parties have also agreed that Defendant could initially obtain written discovery from at least one Plaintiff at each relevant location and that Defendant would then take depositions of Braddy, at least 4 other Plaintiffs as well as 2 non-party witnesses identified by Plaintiffs. *Id.* at ¶ 5. This was just an initial round with others to potentially take place as discovery progressed.

Given the number of locations, the alleged operational nuances associated with each location, and the relatively small number of Plaintiffs from many, absent an agreement with Defendant, Plaintiffs' trial plan may have included testimony from up to 20 Plaintiffs.[5] *Id.* at ¶ 9. Defendant likely would have deposed all trial witnesses not previously deposed. *Id.* Similarly, Plaintiff would likely want to depose any of Defendant's trial witnesses not yet deposed. *Id.* Thus, there would likely be another round of pre-trial depositions. *Id.* While this is manageable and not particularly unique for a collective action, it would be expensive relative to the amount at issue in this case in part because many of the trial witnesses would need to travel from Georgia and East

---

[5] Plaintiffs cannot state with certainty how many Plaintiffs would have testified at trial, but it would have been no less than 5 and depending on the factual development of the case, may have been 20 or more.

Tennessee for trial. *Id.* Moreover, Plaintiffs would have had to put on witnesses other than Plaintiffs, including managers and former managers at the various locations. *Id.*

Further, as detailed in Footnote 3, *supra*, data sampling indicated that approximately 42% of the workweeks may not result in overtime violations even if Plaintiffs' proved that they worked through every single uncompensated meal period. *See also Yezbak Dec.*, ¶ 8. Therefore, absent settlement, Plaintiffs would have had to seek leave to amend the complaint to include state law breach of contract claims in Tennessee and Georgia in order to recover their straight time pay in overtime workweeks.[6] Absent such an amendment the Plaintiffs would only be able to recover rather limited damages in an estimated 58% of workweeks.[7] For its part, the Defendant would have certainly opposed such an amendment, resulting in further litigation on the issue of the amendment itself. Should the Court have ultimately been willing to grant such an amendment, it would likely necessitate moving the trial date which would result in delay. If either side appealed the results at trial, it could be 3 years or more before this case is resolved. Such an amendment, in and of itself, if granted, would certainly have resulted in much more additional cost, complexity and most likely would have increased the duration of the case.

Finally, even if Plaintiffs were to win on their claim of uncompensated meal breaks, there is uncertainty as to the amount of time a jury would conclude that Plaintiffs actually worked during their meal breaks, the number of breaks per week that were actually uncompensated, and whether the Defendant actually knew or should have known that work was being performed during the meal breaks given a written company policy that prohibited such work.

---

[6] One plaintiff worked in Kentucky.

[7] Less if the jury determined their off the clock work amounted to less than 2.5 hours per week.

Based on the foregoing, continued litigation through trial and appeal would be fairly complex and extremely costly relative to the damages at issue. As such, Factor 2 weighs heavily in favor of approval of the Settlement Agreement.

### 3. Discovery Has Advanced Far Enough to Allow the Parties to Resolve the Case Responsibly [Factor 3].

The Parties to this case recognized early on that, because the Plaintiffs are relatively low wage workers[8] and the number of off the clock hours alleged are relatively modest, a cooperative approach to discovery that would provide enough information for the parties to evaluate the strengths and weaknesses of their case, without needlessly running up costs and fees on depositions was most appropriate here. *Id.* at ¶ 4. Braddy responded to interrogatories and requests for production of documents and produced all documents in her possession. *Id.* Defendant responded to interrogatories and requests for production and provided Plaintiffs with extensive time and pay information for each of the Plaintiffs, as well as other documents such as personnel files, policies and information about the various locations. *Id.*

In addition to discovery, Plaintiffs' counsel obtained detailed information from approximately one-third of the Plaintiffs as Plaintiffs' counsel conducted extensive surveys of the Plaintiffs. *Id.* Plaintiffs' counsel carefully reviewed and analyzed the survey responses. *Id.*

Although much discovery remained, the Parties exchanged and reviewed enough relevant and strategically-targeted information to resolve the case responsibly. Factor 3 weighs heavily in favor of Court approval of the Settlement Agreement.

---

[8] Braddy earned $12 per hour, a rate that Plaintiffs' counsel determined was above average for the Plaintiffs who averaged $10.15 per hour.

11

### 4. Significant Litigation Risk Exists on Certain Issues and Weighs in Favor of Settlement [Factor 4].

Plaintiffs certainly believe that their legal position is strong. Defendant, for its part, takes great issue with Plaintiffs' allegations and has (and continues to) vehemently contest Plaintiffs' allegations and claims. As customary, the Settlement Agreement in issue reflects that the settlement represents a "compromise of disputed claims, and this Agreement is not, and is not to be construed as, an admission by the Company of any liability whatsoever, nor is it, nor shall it be construed as, an admission of any act or fact whatsoever, including any violation of federal or state statute, ordinance, directive, regulation, order (including executive orders) or common law."

The fact is that the Parties feel that they have strong positions and that they will ultimately disprove the other's position. However, the Parties recognize that continued litigation, by its very nature, presents certain risks and significant expenses for both Parties. As eloquently recognized by District Court for the Eastern District of Michigan, "[w]hatever the relative merits of the parties' legal positions, there is no risk-free, expense-free litigation." *Sheick v. Auto. Component Carrier LLC*, 2010 U.S. Dist. LEXIS 110411 (E.D. Mich. Oct. 18, 2010).

Plaintiffs, for their part, recognize that there is a significant risk of losing the case because a jury, among other things, could find that Plaintiffs received meal breaks or that Defendant did not know that Plaintiffs were not receiving meal breaks (particularly because many Plaintiffs worked in a location without a supervisor on site). Plaintiffs also faced the risk of decertification, that a jury may award less in damages than obtained in the settlement, that they fail to prove a willful violation of the FLSA (so the recovery period would be limited to two years), and that Defendant can establish they acted in good faith (so that no liquidated damages would be awarded).

The greatest risk impacting damages from the Plaintiffs' perspective, however, stems from Plaintiffs' counsel's analysis of the on the clock hours worked by a sample of 23 Plaintiffs from

12

the locations where over half of the Plaintiffs worked. Assuming this data is representative of all Plaintiffs, then the Plaintiffs worked fewer than 37.5 hours per week in 42% of their workweeks. Therefore, even if Plaintiffs proved that 5 meal periods a week were worked off the clock, there would be no FLSA recovery for Plaintiffs. Accordingly, in order to recover straight time wages in those 42% of workweeks, Plaintiffs would need to prevail on currently unpled state law claims in Tennessee and Georgia. Were the Court to allow an amendment to include those specific state law claims, Plaintiffs' ability to prevail on such state law claims is not a certainty. Further, if the Plaintiffs were able to prove damages, the damages for those workweeks would be less because: (1) damages would be paid at straight time; (2) Plaintiffs likely worked fewer shifts when they did not reach the overtime threshold; and, (3) liquidated damages are not available. So, significant litigation risk does exist on certain key issues in this case and supports the proposed settlement.

### 5. The Public Interest Weighs in Favor of Approval of the Settlement Agreement [Factor 5].

The resolution of this litigation will, among other things (i) provide back pay and liquidated damages to all Plaintiffs, (ii) ensure certainty for all concerned without more delay, and (iii) obviate the need for months or years of additional litigation, all of which are consistent with the public interest.

Accordingly, this Settlement Agreement simultaneously benefits the parties and serves the public interest by ensuring compensation to the class members for the alleged previously unpaid work and resolving this federal court dispute with the maximum possible expediency and efficiency. See *Edwards v. City of Mansfield*, No. 1:15-CV-959, 2016 U.S. Dist. LEXIS 64159 (N.D. Ohio May 16, 2016) (approval of a fair and reasonable agreement promotes the public's interest in encouraging settlement of litigation).

13

**B. Plaintiffs Submit that The Proposed Service Payment to Plaintiff Braddy Is Fair, Reasonable and Adequate and Should be Approved by the Court.**

Plaintiffs submit that the proposed service payment of $5,000 to Braddy is fair, reasonable and adequate.[9]  As one court explained in approving service payments to plaintiffs involved in filing and litigating a similar claim, "in a wage and hours case, where a low level employee assumes responsibility for prosecuting an action against an employer and takes considerable personal risk in so doing, such awards are singularly appropriate." *Henry v. Little Mint, Inc*., No. 12 Civ. 3996(CM), 2014 U.S. Dist. LEXIS 72574 (S.D.N.Y. May 23, 2014). Service payments in wage and hour actions "serve the dual functions of recognizing the risks incurred by named plaintiffs and compensating them for their additional efforts." *Mills v. Capital One*, No. 14 Civ. 1937(HBP), 2015 U.S. Dist. LEXIS 133530 (S.D.N.Y. Sept. 30, 2015).  Service payments reflect the vocational risks assumed by a named plaintiff and the contribution to the progress of a case made by a plaintiff who secures counsel and participates in discovery. *See, e.g., Bozak v. FedEx Ground Package System, Inc.*, No. 3:11–cv–00738–RNC, 2014 U.S. Dist. LEXIS 106042 (D. Conn. July 31, 2014). "[B]ecause a named plaintiff is an essential ingredient of any [collective] action, an incentive or service award can be appropriate to encourage or induce an individual to participate in the suit" and to other participating plaintiffs because class counsel "may need the support and assistance of other class members who are not named plaintiffs" during the course of the litigation.  *Scovil v. FedEx Ground Package Sys*., No. 1:10–CV–00515–DBH, 2014 U.S. Dist. LEXIS 33361 (D. Me. Mar. 14, 2014) (approving service payments between $10,000 and $20,000 to named and participating plaintiffs).  In determining whether a service payment is warranted, courts consider "the steps these individuals have taken to protect the interests of the class, the

---

[9] Defendant takes no position on this issue.  Defendant has neither participated in nor objected to Plaintiffs' decision as to how the settlement proceeds should be allocated amongst themselves.

degree to which the class has benefited from those actions, the amount of time and effort they have expended in pursuing the litigation, and any negative effects that they have risked." *Id.*

Here, Braddy expended significant time for the benefit of the Plaintiffs. *Id.* at ¶ 3. She met with counsel for extended periods of time at the initial investigation stage and continued to assist counsel while drafting the complaint, while counsel investigated the scope of any FSLA violations and throughout the litigation as needed. *Id.* Braddy timely responded to extensive written discovery and provided documents that were helpful to the case. *Id.* She assisted counsel by identifying key witnesses and arranging for communications with these witnesses. *Id.* Braddy also attended a full day of mediation in Nashville on behalf of the Plaintiffs. *Id.* Further, she committed to sitting for her deposition and testifying at trial as need be (even though she did neither because the case settled). *Id.* Braddy was responsive and diligent in her activity as named Plaintiff and served the Plaintiffs well. *Id.* Braddy will receive a $5,000 service payment, in addition to her allocation of the settlement proceeds, for her efforts as Named Plaintiff.

Importantly, Braddy's service payment is entirely reasonable and well within the range awarded by district courts in this Circuit, and in wage and hour actions in other jurisdictions. *See e.g.*, *Abadeer v. Tyson*, 3:09-cv-00125, DE 420 (M.D. Tenn. October 17, 2014) (approving service awards ranging from $500 to $11,500 for participating plaintiffs); *Karic v. Major Auto. Cos.*, No. 09 CV 5708 (CLP), 2016 U.S. Dist. LEXIS 57782 (E.D.N.Y. Apr. 27, 2016) (approving $20,000 service awards to each of the seven named plaintiffs for: "informing counsel of the facts initially and as the case progressed; providing counsel with relevant documents in their possession; reviewing defendants' document production; appearing for depositions; responding to defendants' discovery requests; assisting counsel to prepare for mediation and settlement discussions; and reviewing and commenting on the terms of the settlement); *Bijoux v. Amerigroup N.Y., LLC*, No.

15

14–CV–3891 (RJD)(VVP), 2016 U.S. Dist. LEXIS 68969 (E.D.N.Y. May 12, 2016) (awarding service payments between $2,000 and $10,000 to participating plaintiffs); *DeLeon v. Wells Fargo Bank, N.A.*, No. 12 Civ. 4494(RLE), 2015 U.S. Dist. LEXIS 65261 (S.D.N.Y. May 7, 2015) (approving $15,000 service award to named plaintiff); *Swigart v. Fifth Third Bank*, No. 1:11–cv–88, 2014 U.S. Dist. LEXIS 94450 (S.D. Ohio July 11, 2014) (approving "modest class representative award" requests of $10,000 to each of the class representatives in FLSA/Rule 23 Hybrid); *Fosbinder-Bittorf v. SSM Health Care of Wisconsin, Inc*., No. 11–cv–592–wmc, 2013 U.S. Dist. LEXIS 152087 (W.D. Wis. Oct. 23, 2013) (approving service payments between $5,000 and $15,000 to named and participating plaintiffs in FLSA/Rule 23 Hybrid); *Henry v. Little Mint, Inc.*, No. 12 Civ. 3996(CM), 2014 U.S. Dist. LEXIS 72574 (S.D.N.Y. May 23, 2014) (approving $10,000 service awards to named plaintiffs in FLSA/Rule 23 Hybrid); *Hernandez v. Merrill Lynch & Co*., No. 11 Civ. 8472(KBF)(DCF), 2013 U.S. Dist. LEXIS 42681 (S.D.N.Y. Mar. 21, 2013) (approving service payments of $15,000 to named plaintiffs, $12,000 to participating plaintiffs, and $4,000 to an FLSA-opt in plaintiff in FLSA/Rule 23 Hybrid); *Toure v. Amerigroup Corp*., No. 10 Civ. 5391(RLM), 2012 U.S. Dist. LEXIS 110300 (E.D.N.Y. Aug. 6, 2012) (approving services awards of $10,000 to named plaintiffs and $5,000 to opt-in plaintiffs in FLSA Rule/23 Hybrid); *Lovaglio v. W & E Hospitality, Inc*., No. 10 CIV 7351(LLS), 2012 U.S. Dist. LEXIS 94077 (S.D.N.Y. July 5, 2012) (approving service awards of $10,000 to named plaintiffs in FLSA/Rule 23 Hybrid); *Willix v. Healthfirst, Inc*., No. 07 Civ. 1143(ENV)(RER), 2011 U.S. Dist. LEXIS 21102 (E.D.N.Y. Feb. 18, 2011) (awarding service payments ranging from ranging from $7,000 to $30,000 in FLSA/Rule 23 Hybrid);*Torres v. Gristede's Operating Corp.*, No. 04 Civ. 3316 (PAC), 2010 U.S. Dist. LEXIS 139144 (S.D.N.Y. Dec. 21, 2010) *aff'd*, 519 F. App'x 1 (2nd Cir. 2013) (finding service awards of $15,000 to each of 15 named plaintiffs reasonable). Further, the

$5,000 in service awards represents 3.2% of the *net* settlement fund, and as such is well within the range customarily awarded in similar cases. *Hyun v. Ippudo USA Holdings*, 14-CV-8706 (AJN), 2016 U.S. Dist. LEXIS 39115 (S.D.N.Y. Mar. 24, 2016) (service awards representing 5% of the settlement fund, is "well within the range of service awards recently approved" in FLSA cases).

Braddy performed substantial services and bore substantial risk, which ultimately resulted in what Plaintiffs' counsel consider to be an excellent settlement on behalf of the class.

### C. Attorneys' Fees Are Recoverable Under the FLSA, 29 U.S.C. §216(b) and Should Be Awarded as Set Forth in the Settlement Agreement.[10]

The FLSA provides "[t]hat the court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." 29.U.S.C. §216(b). An award of attorneys' fees under §216(b) is mandatory, if Plaintiffs prevail. *See Smith v. Service Master Corp., et al.,* 592 Fed. Appx. 363, 367 (6th Cir. 2014); *United Slate, Tile & Composition Roofers, Damp and Waterproof Workers Ass'n Local 307 v. G & M Roofing and Sheet Metal Co.*, 732 F.3d 495, 501 (6th Cir. 1984) *citing Montgomery Ward & Co. v. Antis*, 158 F. 2d 948 (6th Cir. 1947). Congress enacted fee-shifting statutes such as the FLSA "in order to ensure that federal rights are adequately enforced." *Morales v. Farmland Foods, Inc.*, No. 8:08CV504, 2013 U.S. Dist. LEXIS 56501 (D. Neb. Apr. 18, 2013). Under a fee-shifting statute, "a reasonable fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious action to vindicate the rights protected under the statute." *Id.* When assessing a reasonable fee under the FSLA, the court should consider approving awards that will ensure that "attorneys of quality and experience with other profitable demands upon their time will not need to sacrifice income available in alternative enterprises in order to

---

[10] Defendant does not oppose the amount of Plaintiffs' fees and expenses and does not contest the reasonableness of the Plaintiffs' fees and expenses.

17

effect a public policy intended to protect all citizens." *Id.* (citing *Casey v. City of Cabool*, 12 F.3d 799, 805 (8th Cir. 1993)).

Plaintiffs' counsel has extensive experience litigating multi-plaintiff wage and hour actions and contend that they litigated and settled this case as efficiently as possible. *Yezbak Dec., ¶* 16. Plaintiffs' counsel took this case on a contingency basis, with the understanding that if there was no recovery, there would be no entitlement to fees. Plaintiffs' counsel also agreed to advance all expenses necessary to litigate this case to completion. Plaintiffs agreed to pay either a 40% contingency fee or Plaintiffs' counsel's hourly fees, whichever is greater. *Id.* at. ¶ 23.

Despite entitlement to a 40% contingency fee, Plaintiffs' counsel here is seeking a contingency fee of only 34% of the total recovery ($85,680.00). *Id.* The fee is reasonable and should be approved. It is less than the contractual fee agreed to by Braddy, and each opt-in Plaintiff, by opting-into this case agreed to the contractual fees.[11] *Id.* Further, all Plaintiffs were advised of the specific dollar amount of fees and costs after the settlement was reached. *Id.* No one has contacted Plaintiffs' counsel to complain about the fees or costs. *Id.*

Cognizant of the fact of the relatively small class size and the relatively modest damages per Plaintiff, counsel litigated this case as efficiently as possible prior to mediation so that Defendant's resources could be preserved to pay a fair settlement to the Plaintiffs. Nevertheless, Plaintiffs' counsel expended considerable time and resources with respect to this case. Further, if the case did not settle, Plaintiffs' counsel was committed to devoting whatever time and money was necessary to litigate the matter to completion. Three billing professionals, attorneys Daniel Arciniegas, Charles Yezbak and paralegal Rain Xue devoted over 211 hours to this case. *Id.* at. ¶

---

[11] For example, the consent to sue form states: "I designate the plaintiff to act as my representative to make decisions concerning … the entering of an agreement with plaintiffs' counsel concerning attorneys' fees, costs and all other matters pertaining to this litigation."

22. The blended hourly rate based on the contingency fee is approximately $404 per hour. *Id.* It is anticipated that counsel will spend an additional 3 to 5 attorney hours and 10 to 15 paralegal hours, communicating with the Court and Defendant to finalize the settlement agreement, administering the settlement, and answering questions from Plaintiffs (which will reduce that blended rate). The Court need not perform a lodestar cross check because the Plaintiffs have agreed to 40% contingency fee and Plaintiffs' counsel is recovering a 34% contingency fee – less than the amount agreed upon by Plaintiff. Nevertheless, Plaintiffs' counsel's lodestar is $81,745 based on their normal hourly rate multiplied by hours expended. *Id.* Thus, the fees are reasonable and should be approved and result in a reasonable blended rate of $404 per hour for the services rendered and are less than the Plaintiffs have agreed to pay.

### V. Conclusion

For the reasons set forth above, the Parties respectfully request that the Court enter an order:

1.     Approving the Settlement Agreement, including the distribution to Plaintiffs attached as Exhibit A of the Settlement Agreement, the attorneys' fees and costs, and the service payment to Braddy;

2.     Dismissing this case with prejudice with respect to the Plaintiffs identified in Exhibit A to the Settlement Agreement and as defined in paragraph 1.1 there, who are parties to the Settlement Agreement;

3.     Holding that each party shall be responsible for their own attorneys' fees and costs except as stated in the Settlement Agreement.

4.     Retaining jurisdiction over the parties to the Settlement Agreement for the purpose of interpretation, compliance and enforcement of the Settlement Agreement and the Agreed Order of Dismissal with Prejudice.

19

5. Holding that if Defendant fails to make all payments required in the Settlement Agreement, any affected Plaintiff may file a notice with this Court in which case this matter shall be re-opened.

Dated: October 12, 2017          Respectfully submitted,

YEZBAK LAW OFFICES

By: _/s/ Charles P. Yezbak, III_
Charles P. Yezbak, III (#18965)
2002 Richard Jones Road, Suite B-200
Nashville, Tennessee 37215
(615) 250-2000
(615) 250-2020 Facsimile
yezbak@yezbaklaw.com

*Attorneys for Plaintiffs*

EVANS HARRISON HACKETT PLLC

By: _/s/ John C. Harrison_
     John C. Harrison (BPR # 7308)
By: _/s/ Timothy L. Mickel_
     Timothy L. Mickel  (BPR # 17486)
     835 Georgia Avenue, Suite 800
     Chattanooga, TN 37402
     Phone: 423.648.7890
     Facsimile:  423.648.7897
     jharrison@ehhlaw.com
     tmickel@ehhlaw.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

       The undersigned hereby certifies that a true and correct copy of the foregoing document Memorandum in Support of Joint Motion for Settlement Approval was filed electronically with the Clerk's office by using the CM/ECF system and was served on electronically upon the following on October 12, 2017:

John C. Harrison
  BPR # 7308
  Email: jharrison@ehhlaw.com
Timothy L. Mickel
  BPR # 17486
  Email: tmickel@ehhlaw.com
EVANS HARRISON HACKETT PLLC
One Central Plaza, Ste. 800
835 Georgia Avenue
Chattanooga, TN 37402
Phone: 423.648.7890

*Attorneys for Defendant*
Five Star Food Service, Inc.

                                       **/s/ *Charles P. Yezbak, III***
                                       Charles P. Yezbak, III